Filed 3/19/14  In re C.M. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re C.M. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO DEPARTMENT OF HUMAN SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>C.M.,<br><br>        Defendant and Appellant. | A138707<br><br>(San Francisco City & County Super. Ct. Nos. JD12-3043, JD12-3043A, JD12-3043B) |

C.M. (Father) appeals from an order sustaining in part the allegations of a supplemental petition under Welfare and Institutions[1] Code section 387 and removing Father's three minor children from his custody.  Father contends the evidence was insufficient to support the allegations and the trial court erred in removing the minors.  We affirm the trial court's order.

## I.  FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.  *Original Petition*

On February 17, 2012, real party in interest San Francisco Department of Human Services (Agency) filed a section 300 petition alleging Father (aged 42) is father to nine-

---

[1] All statutory references are to the Welfare and Institutions Code.

[2] We draw the operative facts from our nonpublished opinion in *C.M. v. Superior Court* (Nov. 7, 2013, A139365), arising from an earlier writ petition in this proceeding.

year-old C.M. (male), seven-year-old Ch.M. (female), and five-year-old G.M. (female), and the children come within section 300, subdivisions (b) and (g). The petition alleged as follows: Mother's whereabouts are unknown. The family has a history of referrals, including sexual abuse by Father of his stepdaughter, G.S. Upon dismissal of the prior dependencies, during which Father was found to be the presumed father of C.M., Ch.M. and G.M., he was awarded sole physical custody of his three children, as well as his stepdaughter, G.S. Father has a history of failing to timely collect the children from their after-school program, sends them to school appearing unwashed and in dirty, malodorous clothes, and fails to provide adequate hygiene for C.M., who suffers from enuresis and is frequently reported as smelling of urine.

The Agency filed a jurisdiction report with the petition, authored by protective services worker (PSW) Judy Chu. Chu reported Father had been negligent in caring for the children, reflected in their chronic absences from school and their poor grooming and hygiene when they did attend school, and failed to follow through on recommendations to reduce absenteeism and for assessments to meet the children's special needs. When Chu attempted to visit the home, Father would not let her in. In addition, she found there was no record of any of the children receiving medical care since 2008.

Chu opined the children were at risk of emotional damage as the result of Father's relationship with their half-sister, his wife's 19-year-old daughter, G.S. Chu noted Ch.M. had been interviewed by clinical psychologist Caroline Salvador-Moses and, according to Salvador-Moses, appeared very uncomfortable when asked about the relationship. Salvador-Moses expressed " 'serious concerns regarding the emotional impact that the inappropriate relationship between [Father] and [G.S.] is having on the children' " and opined Ch.M. is aware there is something not right about the relationship between her older sister and her father. Salvador-Moses stated C.M. also showed signs of discomfort when talking about G.S. and Father " 'but was more hesitant to reveal information, most likely for fear of possible disruption to the family.' "

Chu believed there was a substantial risk the children could be sexually abused because Father may have sexually abused his stepdaughter G.S. as a child. Chu included

copies of numerous referrals from past years in which there were reports that G.S. was being sexually abused by Father. Although those referrals were not sustained, Ch.M. now reported she observed the relationship between Father and G.S. when G.S. was 17. Also, the children's school principal stated she saw Father and G.S. interacting in an inappropriate manner when G.S. was 16 or 17. When questioned by another agency social worker, Father denied that he was in a relationship with G.S.

On April 2, 2012, the Agency filed a disposition report, authored by PSW Lily Yee. In the disposition report, Yee stated the current referral was for neglect, and recommended that Father participate in in-home support services to assist with his parenting skills, participate in a psychological evaluation, obtain any therapy he needs, and participate in a substance abuse assessment. Individual therapy was recommended for each of the children. The case plan recommended Father obtain appropriate medical and dental care for the children, ensure the children's regular school attendance and individual therapy, obtain regional center services for G.M., ensure the children maintain proper hygiene and dress appropriately, and maintain a clean and safe home.

PSW Yee noted that the children were making progress in their school attendance in the six weeks since referral, but continued to express concerns about the children's medical care, and about safety issues presented by having so much clutter and debris in the house. Further, because of the alleged sexual relationship between Father and G.S. when she was a minor, the Agency recommended that all three minor children should engage in "counseling for further monitoring of the situation and to address other emotional needs that they may have."

After the jurisdiction/disposition hearing on the original petition was continued, the Agency filed an amended petition on April 20, 2012. The amended petition alleged counts under section 300, subdivisions (b), (c), (d), and (g). Under subdivision (b), the Agency alleged Father needed the Agency's assistance to ensure the children's continued school attendance, compliance with regional center services, and to maintain their medical, dental, and therapeutic services. Under subdivision (c), the Agency alleged the children were "at substantial risk of suffering serious emotional damage as the result of

3

observing the father's long-term (and ongoing) inappropriate 'spousal' relationship between the father and their (now) adult 1/2 sibling [G.S.] (father's step-daughter), who also resides in the home." The Agency alleged under subdivision (d) there was a substantial risk that the children would "be sexually abused by the father due to numerous past reports that father began an inappropriate sexual relationship with the children's adult 1/2 sibling, [G.S.] (father's step-daughter), when she was only fourteen years old."

On June 8, 2012, the Agency filed an addendum report in advance of the contested hearing on jurisdiction and disposition and attached a copy of Salvador-Moses's report prepared in February 2012. The Agency continued to recommend the children reside in Father's home while receiving family maintenance services. Yee had visited the family home a week earlier and described conditions there as "somewhat of a mess," with "crumbs and scraps" on the floor and flies throughout the house.

The jurisdiction/disposition hearing on the amended petition was held on June 15, 2012. Father waived his rights and submitted on the basis of the Agency's reports. The dependency court sustained the counts under section 300, subdivisions (b) and (g), and struck counts alleged pursuant to subdivisions (c) and (d). The court adopted an amended version of the Agency's case plan requiring that Father continue to provide the children with regular medical and dental care, as well as regional center services where appropriate, ensure the children's regular and timely attendance at school, maintain a clean, safe home for the children free of excessive clutter, ensure the children attend school in clean appropriate clothing, place the children in individual therapy and ensure their regular attendance, begin a course of individual therapy, including a psychological evaluation for the purpose of treatment recommendations, and engage in a course of home parenting classes or support sessions.

On November 27, 2012, the Agency filed a status review report authored by assigned PSW Yisel Ledezma for a status review hearing scheduled for December 13, 2012. The report showed little progress had been made on the case plan ordered by the court five months earlier. After being referred for in-home services, Father met the assigned worker but did not maintain contact. On her monthly visits to the family home,

Ledezma had to remind Father to keep the hallways free of clutter and also noted clutter from the living room was spilling into the dining room. Following the Agency's referral, Father had made no arrangements to have his psychological evaluation conducted by Foster Care Mental Health, nor contacted "A Full Circle" for the children's therapy.

**B.  *Supplemental Petition***

On December 10, 2012, just a few days before the status review hearing on the amended petition scheduled for December 13, the Agency filed a supplemental petition under section 387, seeking detention and out-of-home placement for the three children. The supplemental petition alleged Father had been arrested on December 5, 2012, for theft and for sexual abuse of G.S. when she was a minor, and again alleged that the minor children were at substantial risk for possible sexual abuse and/or neglect. The supplemental petition also alleged the children were at risk of harm because Father failed to maintain a safe and clean home, failed to "engage and/or complete" his family maintenance requirements, and is unable to provide proper care, supervision, or shelter for the children.

A section 387 interim review report filed on the same day as the supplemental petition stated all three children had been removed from the home and placed together in a confidential foster home. In the report, Ledezma stated she received a telephone call on December 6, 2012, from Detective Cecilia Garay of the Daly City Police Department, informing her Father and G.S. had been arrested on theft charges. Upon questioning by Detective Garay, G.S. disclosed she had been sexually abused by Father since the age of 12. When Detective Garay released G.S. and took her home, she observed the home was filthy and unsafe. G.S. also told Detective Garay that Father had methamphetamine at the house. Ledezma also spoke with San Bruno Police Detective Brent Schimeck, who advised Father was initially arrested for theft, and after G.S.'s disclosures of sexual abuse, he was rearrested on sexual abuse charges, and was being held in San Mateo County jail.

The section 387 interim review report further related that Ledezma learned the children had been absent for the last two days with head lice, a chronic problem for this

family according to school authorities. Ledezma, accompanied by a colleague, went to the home, where they found the children in G.S.'s care, and removed them for placement into foster care. Ledezma and her supervisor then met with Father and G.S. separately on December 10, 2012. Both denied that a sexual relationship began before G.S. was 18 years old. G.S. stated that she and Father are "a couple," claiming she had fabricated her story of sexual abuse for the detective.

Regarding Father's compliance with the existing case plan, Ledezma noted Ch.M. told her the house is cleaned only if Ledezma is expected to visit. Ledezma also reported that Epiphany In Home Services terminated parenting services to Father on November 20, 2012, after he failed to communicate with the case worker. Father had been referred to Foster Care Mental Health for an evaluation and was assigned to a psychologist, who reported she had left several messages for Father, but he had not contacted her. At a hearing held on December 11, 2012, the court found the Agency made a prima facie case there was a substantial danger to the children's physical health or that they were suffering severe emotional damage, issued an order of detention, and set the matter for a contested detention hearing.

In an addendum report filed on December 13, 2012, Ledezma stated each of the children had a CASARC (Children and Adolescent Sexual Abuse Resource Center) interview on December 11, 2012, did not disclose any sexual abuse by Father, but appeared anxious and uncomfortable when questioned about Father and G.S. Ch.M. told the interviewer Father slept in a chair in G.S.'s room. Ch.M. also said her younger sister G.M. might "make a mistake" and say Father and G.S. slept in the same bed. According to Ch.M., G.M. had said this before and had been spanked for it. Upon further questioning regarding physical discipline by Father, all three children disclosed Father used a paddle to spank them on the bottom. Ledezma also related she obtained a copy of the police report, which she attached to the addendum report, documenting G.S.'s disclosure that Father had been having intercourse with her since age 12. San Bruno police had sought and obtained an emergency protective order prohibiting Father from living in the family home.

6

A team decisionmaking meeting was held on December 12, 2012, attended by G.S. and Father's mother (paternal grandmother). Father was at home and out of custody on bail, but did not attend the meeting. It was determined the children should remain in foster care with a recommendation they receive therapeutic visitation. Ledezma's assessment was that Father's relationship with G.S. had created anxiety for the children and they were in a situation where they had to lie about the relationship or risk physical punishment by Father if they told the truth. At the contested detention hearing held on December 13, 2012, the children were ordered detained and placed in foster care and the matter was set for a jurisdiction hearing on the supplemental petition.

On January 29, 2013, the Agency filed an amended supplemental petition adding two counts. Count S-7 alleged: "The children are at substantial risk of suffering serious emotional damage as the result of observing the father's long-term (and ongoing) inappropriate 'spousal' relationship between the father and their (now) adult half-sibling, [G.S.] (father's step-daughter), who also resides in the home." Count S-8 alleged: "The father began engaging in unlawful sexual intercourse with his (now adult) step-daughter, [G.S.], when she was a minor. Per [G.S.]'s own admission, the father began grooming her for sex when she was approximately twelve years old. The children are at substantial risk of sexual abuse by their father due to father's sexual abuse of his step-daughter (the children's half-sibling) when she was a minor."

A contested hearing on the amended supplemental petition was held on April 4 and 5, 2013. The court heard testimony from Ledezma, Detective Cecilia Garay, G.S., and the paternal grandmother. Ledezma testified the young children were experiencing anxiety as a result of the relationship between Father and G.S., based on information she had in the file and her conversations with school personnel. Moreover, Ledezma was told Father had made statements Ch.M. and G.M. are not his biological children, raising concerns he would groom them for sexual abuse as he did with their older half-sister. Ledezma believed the relationship between Father and G.S. has caused emotional harm to C.M.; for example, the foster mother reported C.M. urinated on the bed after phone calls with Father. On cross-examination, Ledezma testified as to what had changed to prompt

7

the supplemental petition, stating that Father did not comply with the parenting program, the house continued to be chaotic and was more cluttered, the children continued to have head lice, the children's medical needs were not met, and new information came out confirming the suspected sexual abuse. Regarding future services, Father was asked to have individual therapy and a psychological evaluation, and the Agency had requested an individual therapist for Father who specialized in working with perpetrators of sexual abuse.

Detective Garay testified about her interview with G.S. After G.S. was arrested, police searched her cell phone and found a photograph depicting sexual activity between G.S. and Father. When asked about this image, G.S. described Father variously as her stepfather and her boyfriend. G.S. told the detective that Father came into her life when she was eight, and that the sexual abuse began by the time she was 12. Father began by playing a game that led to him exposing himself to G.S., followed by showing her pornography, which then led to escalating sexual abuse. When G.S. was 14 years old, Father became jealous because she had a boyfriend; at that time he was having sexual relations with G.S. as well as G.S.'s mother. After G.S.'s mother left, Father and G.S. continued their relationship. Detective Garay testified G.S.'s statements were not coerced, were not given in return for any promises, and appeared to be honest. When Detective Garay went to the family's house later in the day, she did not feel it was fit for children and contacted the Agency the next day to voice her concerns. Detective Garay had prepared an audio recording of her interview with G.S., in which the girl discussed the sexual abuse by Father when she was 12 years old. The court admitted the recording into evidence during Detective Garay's testimony and listened to the relevant portions during a break on the second day of the hearing.

Father called G.S., who testified she lied to Detective Garay and that she does not consider Father to be her stepfather "[b]ecause we have always had this strong bond. And it grew past the stepfather-stepdaughter relationship." She testified a sexual relationship with Father began when she was 18 years old. She also testified she has a sibling relationship with the three minors and that they are all "very close as friends and

8

siblings." G.S. testified she told detectives there was methamphetamine in the home because she mistook sea salt for methamphetamine.

After closing argument, the court sustained all of the allegations of the supplemental petition except for count S-2, which alleged Father had substance abuse issues. The court determined there was substantial evidence Father sexually abused G.S. when she was a minor and maintained a dysfunctional relationship with G.S. taking advantage of her young age, her vulnerability, and feelings of abandonment by her mother. Additionally, the court was concerned about the physical and emotional safety of the three minor children, in particular, Ch.M. and G.M., who Father believed may not be his biological children, potentially exposing them to a substantial risk of sexual abuse by Father. The court noted all three children feel they have to lie to protect the two persons they love or face punishment for telling the truth.

The court ordered that dependency status be renewed and that the children be removed from the home and placed in foster care. The court also ordered that services continue to be provided to Father. The court scheduled six- and 12-month review hearings, and reduced Father's visitation from twice a week to once a week.[3]

On May 17, 2013, Father filed the present appeal, challenging the court's jurisdiction and disposition order entered on April 5, 2013.

## II. DISCUSSION

Father contends (1) there was insufficient evidence to support the Agency's section 387 petitions and (2) the court erred in removing custody of the minors from him.

---

[3] While this appeal was pending, the Agency filed form JV-180 requests (Judicial Council Forms, form JV-180), asking that Father's visitation be suspended and his reunification services terminated. After a contested hearing, the court found reasonable services had been provided and there was good cause to terminate services to Father, and set a selection and implementation hearing. In a nonpublished opinion, we denied Father's ensuing petition for extraordinary relief from the order terminating reunification services and setting a selection and implementation hearing. (*C.M. v. Superior Court, supra,* A139365.)

9

**A.** *Applicable Law*

A supplemental petition must be filed under section 387 when the social worker seeks to remove the child from the physical custody of a parent and place the child in a more restrictive level of placement on the ground the court's previous dispositional orders were not effective to rehabilitate or protect the child. (§ 387, subd. (a); Cal. Rules of Court, rule 5.560(c).) "Unlike subsequent petitions (§§ 342, 360, subd. (a), & 364, subd. (e)), no new jurisdictional facts are alleged in a section 387 petition; no different or additional grounds for the dependency are urged. Section 387 petitions concern only changes in the level of placement for a child already adjudicated dependent." (*In re John V.* (1992) 5 Cal.App.4th 1201, 1211.)

Section 387 petitions are subject to bifurcated jurisdictional and dispositional hearings under the same procedures as a section 300 petition. (Cal. Rules of Court, rule 5.565(e).) The purpose of the jurisdictional hearing is to determine whether the factual allegations are true and whether the previous placement was ineffective to protect the child. (*In re Jonique W.* (1994) 26 Cal.App.4th 685, 691.) The Department bears the burden of proving the factual allegations by a preponderance of the evidence. (*Ibid.*) If the supplemental petition is sustained, the court hears evidence on the proper disposition to be made for the child's protection. The same standard applies to removal from parental custody on a supplemental petition as applies to removal of a child from parental custody in an initial or original dependency petition. (*In re Paul E.* (1995) 39 Cal.App.4th 996, 1000–1003.) The child may not be removed from parental custody unless the court finds by clear and convincing evidence (1) there is a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being; and (2) no reasonable means exist to protect the child's physical health without removing him or her from parental custody. (§ 361, subd. (c)(1).)

We review the juvenile court's jurisdictional and dispositional findings on a section 387 petition for substantial evidence, drawing all reasonable inferences from the evidence to support the findings, and viewing the record in the light most favorable to the court's determinations. (*In re H.G.* (2006) 146 Cal.App.4th 1, 12–14.)

10

**B.** *Jurisdictional Findings*

Father maintains there was insufficient evidence the minors were at risk of sexual abuse or neglect (counts S-1, S-8) or of suffering serious emotional damage from observing his relationship with his stepdaughter (count S-7). He also rejects the trial court's findings the minors were at risk due to his care of their health (count S-3), maintenance of the home (count S-4), failure to complete family maintenance services (count S-5), and inability to provide proper care, supervision, and shelter for the minors (count S-6).

**1.** *Counts S-1, S-7, S-8*

Father acknowledges the statements of one of the minor children that Father and G.S. slept in the same bed, kissed on the lips, and held hands. He nonetheless denies sexually abusing G.S., citing the testimony of G.S.'s therapist that G.S. denied having a sexual relationship with Father before she was 18, and the fact no criminal sexual abuse charges were filed against him by the district attorney.[4] Father asks this court to disregard the testimony of Detective Garay and the audio recording of Garay's interview of G.S. concerning Father's sexual relationship with G.S., asserting G.S.'s statements to Garay were the product of duress and coercion.

Although G.S. testified at the hearing that she had lied to Detective Garay and did not begin a sexual relationship with Father until she was 18, the court found otherwise after having an opportunity to observe the demeanor of both witnesses and listen to the recorded interview. In our view, the audio recording does not in any way substantiate G.S.'s claim that Detective Garay pressured and threatened her with jail if she did not admit their sexual relationship began before she was 18. The numerous details G.S. was able to provide concerning her early sexual relationship with Father make it unlikely she could have fabricated the entire story on the spot as her testimony suggests she would have had to do. The recording makes it clear G.S. admitted to the facts concerning her

---

[4] Detective Garay testified she was informed by the district attorney's office the case was rejected because "the witness [meaning G.S.] was no longer cooperating."

11

relationship with Father with the greatest reluctance. She openly expressed her fears that discussing how and when their sexual relationship began would result in her being left alone in the world—that Father would go to prison and her half-siblings would be removed from the home. While Detective Garay was persistent in returning to the subject and trying to get G.S. to open up about the facts, we find no indication that she coerced or pressured G.S. to make up a false story. G.S. narrated in some detail her memory of how her sexual relationship with Father first started when she was 12 or 13 years old while Father was still living with G.S.'s mother, how it rapidly escalated into a full-scale sexual relationship, and how the relationship continued after he was adjudged G.S.'s presumed father and after G.S.'s mother left the home. G.S. also told the detective Father did not believe the two minor girls were his.

We find Garay's testimony and the audiotape do constitute substantial evidence supporting the trial court's findings that Father sexually abused G.S. when she was a minor, and maintained a dysfunctional relationship with her, taking advantage of her young age, vulnerability, and feelings of abandonment by her mother, and setting her up as his "spouse" taking care of the three minor children who are her sisters and brother.

Regarding the dangers to the minor children posed by these facts, PSW Ledezma testified she was concerned about Father's relationship with his stepdaughter before Detective Garay contacted the Agency concerning the sexual abuse allegations. Ledezma reported that the maternal grandmother had told her Ch.M. was not Father's biological child, which concerned her because Ch.M. would soon be reaching the age when G.S. and Father began their sexual relationship. She believed this put Ch.M. at risk of sexual abuse. Minor G.M., who was two years younger than Ch.M., was also at risk for sexual abuse, according to Ledezma. Ledezma also testified Father's minor son, C.M., was at risk for emotional harm, but not sexual abuse.

Psychologist Hugh Molesworth interviewed the minors and visited the family home in June 2012. In a written evaluation placed in evidence, Dr. Molesworth concurred that Father's relationship with G.S. presented "some risk of abuse in the future,

12

when [the minor] girls are post-pubescent."[5] However, he found no signs or present risk of sexual abuse, and did not believe the children had been emotionally harmed as of the date of his report.

With regard to emotional harm, Ledezma noted that before Garay obtained evidence of sexual abuse the minors' school had reported the minors were acting out and experiencing anxiety about Father's relationship with G.S. In her addendum report admitted into evidence, the social worker assessed that this relationship had created "tension and anxiety" for the minors. She testified at the hearing that at the time of their initial removal from the home, the minors said they had been spanked with a paddle if they told anyone Father and G.S. were sleeping together, which the social worker regarded as emotional and physical abuse for disclosing the relationship.

Psychologist Caroline Salvador-Moses, who interviewed the children in advance of the February 2012 jurisdiction hearing, reported she had "serious concerns regarding the emotional impact that the inappropriate relationship between [Father and G.S.] have on the children," and noted both C.M. and Ch.M. showed signs of discomfort about the relationship between their older sister and Father.

Dr. Molesworth identified different possible avenues by which the relationship between G.S. and Father could cause emotional harm to the minors. He believed the pressure to maintain secrecy could eventually lead to emotional distress. He further stated that harm would result from "an internalization of a sense that there are no boundaries between the generations, and that romantic and sexual love between a kid and a parent is permissible." Dr. Molesworth asserted that such "generational boundary crossing" could result in emotional confusion and a vulnerability to future victimization for the children.

In *In re I.J.* (2013) 56 Cal.4th 766, our Supreme Court held that a father's sexual abuse of his daughter over a three-year period was sufficient to support dependency

---

[5] Dr. Molesworth was Father's expert. His evaluation was prepared before G.S. divulged the full extent of her relationship with Father to Detective Garay or how long that relationship had been going on.

13

jurisdiction over his sons when there was no evidence he sexually abused or mistreated them or that they were aware of their sister's abuse. (*Id.* at p. 770.) The court reasoned that the more egregious the abuse, the more appropriate it is for the juvenile court to assume jurisdiction over the siblings. (*Id.* at p. 778.) The court held even a relatively low probability the father would abuse the sons could be considered sufficient to constitute a substantial risk of abuse or neglect as to them for purposes of section 300 due to the severity of the father's abuse of their sister. (*Ibid.*)

We consider Father's continual sexual exploitation of G.S. from age 12 or 13 to age 18 to be even more egregious than the father's conduct in *In re I.J.*[6] The fact G.S. was his stepdaughter does not mitigate the harm he caused her. He was the only father she had known. He callously exploited her youth, vulnerability, and feelings of abandonment by her mother to deprive her of a childhood and induce her to enter into a completely inappropriate and exploitative relationship with him. Under the reasoning of *In re I.J.*, even a relatively low probability of harm to the younger siblings would support the exercise of jurisdiction on this record. In fact, because the two minor girls in this case are the *same* gender as the abuse victim, and there is substantial evidence Father does not think the girls are his biological children, the risks to them are significantly greater than the risk to the sons found sufficient to support jurisdiction in *In re I.J.* Sufficient evidence thus supports the trial court's findings that the girls are at substantial risk for sexual abuse and neglect.

Based on the testimony and expert reports discussed above, we find substantial evidence also supports the trial court's finding that all three minors are at risk for emotional harm as a result of exposure to Father's inappropriate ongoing "spousal" relationship with their half-sibling.

---

[6] The abuse findings in *In re I.J.* were that over a three-year period starting when she was 11 years old, I.J.'s father had on various occasions fondled and digitally penetrated I.J.'s vagina, raped her by placing his penis in her vagina, forced the child to expose her vagina to him and orally copulated her, and forced her to watch pornographic videos with him. (*In re I.J., supra,* 56 Cal.4th at p. 771.)

14

## 2. *Counts S-3 to S-6*

Father also maintains insufficient evidence supported the court's findings that the minors were at risk because of his failure to (1) maintain well-child health care (count S-3); (2) provide a safe and clean home (count S-4); (3) engage in or complete family maintenance services (count S-5); and (4) provide proper care, supervision, and shelter for the minors (count S-6).

As noted earlier, following the jurisdiction/disposition hearing on the amended petition held on June 15, 2012, the court adopted an amended version of the Agency's case plan requiring, among other things, that Father continue to provide the children with regular medical and dental care, as well as regional center services where appropriate, ensure the children's regular and timely attendance at school, maintain a clean, safe home for the children free of excessive clutter, place the children in individual therapy and ensure their regular attendance, begin a course of individual therapy, including a psychological evaluation for the purpose of treatment recommendations, and engage in a course of home parenting classes or support sessions. In a status review report filed five months later, the social worker wrote that Father had made little progress on these matters. He failed to maintain contact with the worker assigned for in-home services, failed to contact the provider assigned for the children's therapy, and made no arrangements for his own psychological evaluation. The hallways were still cluttered and the social worker reported Detective Garay found the home to be filthy and unsafe when she visited in December 2012. At the hearing, the social worker testified Father did not comply with the parenting program, the house continued to be chaotic and cluttered after a partial cleanup, and the children continued to have lice and medical and mental health needs that were not met.

In our view, there was substantial evidence to support the trial court's true findings on counts S-3 through S-6. Father's near complete lack of cooperation or compliance with the case plan in those matters supported the fundamental basis for the section 387 petition that the court's previous dispositional orders had not been effective to protect the minors. Regardless, the evidence supporting the true findings on the sexual abuse counts

(S-1, S-7, and S-8) was sufficient by itself to uphold the juvenile court jurisdiction over the minors.

## C. *Removal*

Father contends the court erred in removing custody of the minors from him because there was no clear and convincing evidence of a risk of harm to them in his custody.

Section 361, subdivision (c) provides in pertinent part as follows: "A dependent child may not be taken from the physical custody of his or her parents . . . unless the juvenile court finds clear and convincing evidence of any of the following circumstances . . . : [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody. [¶] . . . [¶] (4) The minor or a sibling of the minor . . . is deemed to be at substantial risk of being sexually abused, by a parent, . . . and there are no reasonable means by which the minor can be protected from . . . a substantial risk of sexual abuse without removing the minor from his or her parent . . . ." A court's dispositional order for removal is reviewed for substantial evidence. (*In re H.G.*, *supra*, 146 Cal.App.4th at pp. 12–13.)

In our view, substantial evidence supports removal of the minors under section 361, subdivisions (c)(1) and (4). Contrary to Father's claim, there was ample evidence he sexually abused G.S. starting when she was 12 years old, and that the minor girls are at substantial risk of abuse at his hands. Further, there was sufficient evidence all three minors would face a serious and substantial danger to their emotional well-being due to Father's inappropriate relationship with his stepdaughter. Father fails to show there is any reasonable means of protecting the minors from these dangers short of removing them from his custody. His state of denial regarding the inappropriateness of his relationship with his stepdaughter and complete lack of cooperation with the case plan

16

underlines that removal of the minors from his custody is the only option that will ensure their protection.

## III.  DISPOSITION

The trial court's findings and order after hearing on the section 387 petition are affirmed.

_____
Margulies, Acting P.J.

We concur:

_____
Dondero, J.

_____
Banke, J.

17